UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATHAN BENJAMIN MYERS, a/k/a BEN MYERS, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 09 C 5958 |
| THE CITY OF CHICAGO, a Municipal Corporation; JOE MOORE, Individually, and in his official capacity as Alderman of the 49th Ward for the City of Chicago; PATRICIA A. SCUDIERO, Individually, and in her official capacity as Commissioner of Zoning and Land Use Planning for the City of Chicago, | ) ) ) ) ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In September 2008, Plaintiff Nathan Benjamin Myers ("Plaintiff" or "Myers") sought to lease property that he owns in Chicago's 49th Ward to the Sigma Pi Fraternity ("Sigma"), an organization chartered with Loyola University of Chicago. (Am Compl. ¶ 3-8.) Joe Moore, Alderman of the 49th Ward, warned Plaintiff that his proposed use of the property would require a special use permit under a local zoning ordinance. Plaintiff made efforts to convince Alderman Moore, as well as Patricia Scudiero, the City's Commissioner of Zoning and Land Use Planning, that Sigma was a religious-based fraternity that did not require a special use permit, but he was unsuccessful. Alderman Moore maintained his position, Commissioner Scudiero never made a determination about the applicability of the permit requirement, and Plaintiff never sought a special use permit. In September 2009, several city inspectors searched Plaintiff's property, allegedly at the direction of Moore and Scudiero.

Plaintiff now brings this *pro se* complaint against Moore, Scudiero, and the City of Chicago (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983. Plaintiff specifically challenges Defendants' interpretation of the local zoning ordinance under the Fourteenth Amendment, claims

that the search of his property constituted a violation of the Fourth Amendment, and brings state law claims for promissory estoppel and conspiracy. Plaintiff seeks a declaratory judgment, injunctive relief and damages against the City, and relief against the two other Defendants in their official and individual capacities. Defendants have moved to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(6). For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part.

## **FACTUAL BACKGROUND**

The following factual allegations are drawn from Plaintiff's Amended Complaint and are accepted as true for purposes of this motion to dismiss. *Sprint Spectrum L.P. v. City of Carmel, Ind.*, 361 F.3d 998, 1001 (7th Cir. 2004). Plaintiff owns a two-story single family home located at 1102 W. North Shore Avenue in Chicago, Illinois (hereinafter, "the subject property"). (Am. Comp. ¶ 3.) On September 6, 2008, Sigma approached Plaintiff about the possibility of leasing the subject property. Plaintiff showed the property to several Sigma members and reached an agreement with Sigma to lease the property for $6,000 per month, beginning in March 2009. (*Id.* ¶ 8.) On September 21, 2008, Michael T. Land, a Staff Assistant to Alderman Moore, informed Plaintiff that Defendant Moore wanted to discuss Plaintiff's plans for the property. (*Id.*) Mr. Land explained to Plaintiff that Defendant Moore believed that Plaintiff would need a special use permit to lease his property to a fraternity under Chapter 17 of the Chicago Zoning Ordinance (hereinafter, "the Ordinance"). (*Id.* ¶9-10.) The Ordinance provision at issue designates various types of residential living accommodations, some of which are permitted by right and others for which special use approval is required, depending on the zoning district.[1] In an e-mail message to Mr. Land on September 24, 2008, Plaintiff asserted that the Ordinance did not require a special use permit in his case. (*Id.* ¶ 14.) Plaintiff argued that Sigma is a "religious-based organization" whose members

---

[1] Chapter 17-2, Chicago Zoning Ordinance, Ex. 2 to Am. Compl.

2

must take a "religious vow" and express a "strong Christian faith." Thus, Plaintiff asserted, the subject property falls into the zoning category for "Convents and Monasteries," which do not require a special use permit. (*Id.* ¶ 14-15; Chapter 17-2, Chicago Zoning Ordinance, Ex. 2 to Am. Compl.) In his complaint, Plaintiff admits that he has never applied for a special use permit because, he asserts, "an application for a special use permit would be an admission that Sigma is not a religious-based organization." (Am. Comp. ¶ 31.)

On September 25, 2008, Plaintiff met with Mr. Land, Defendant Moore, Steve Brill, and Amy Myers to discuss his plans to lease his property to Sigma.[2] At the meeting, Defendant Moore reiterated that the City Ordinance required Plaintiff to obtain a special use permit in order for Plaintiff to lease the subject property to a fraternity. Moore also allegedly told Plaintiff that he was opposed to leasing the property to a fraternity and that "the chance of Myers['] obtaining a special use permit was between 'nil and none.'" (*Id.* ¶ 16.) Plaintiff objected to Defendant Moore's position, again invoking the exception under the Ordinance for "Convents and Monasteries." (*Id.*) When Plaintiff pointed out that another religious-based fraternity, located a short distance from the subject property, had not obtained a special use permit,[2] Moore responded by saying that "the [other] fraternity must have been 'grandfathered in' under the statute." (*Id.* ¶ 17.)

In March 2009, Sigma members again approached Plaintiff about leasing the subject property. Plaintiff explained that "there were still some unresolved legal issues regarding the property, and therefore, [he] could not yet give Sigma a lease." (*Id.* at ¶ 21.) Two months later, Plaintiff agreed to allow several members of Sigma to store some of their personal belongings at the subject property "with the understanding that the subject property could not be rented until the

---

[2] Plaintiff does not explain the role of Mr. Brill and Ms. Myers at this meeting, but it appears from his complaint that they may be other employees of the City.

[2] Plaintiff provides no details about this other fraternity other than its address. (Am. Compl. ¶ 17.)

3

zoning issue was resolved with the City." (*Id.* ¶ 22.) On May 31, 2009, Defendant Moore visited the subject property, apparently suspicious that Plaintiff had leased the property to the fraternity. When Plaintiff again urged that leasing his property to Sigma should not require a special use permit, Defendant Moore "became enraged," declaring that he planned to "'throw the book at'" Plaintiff and was "'going to get'" him. (*Id.* ¶ 23.)

On June 10, 2009, Plaintiff met with Mark Limanni, Deputy Commissioner of the Code Enforcement Division of the Department of Zoning and Land Use Planning. Mr. Limanni recommended that Plaintiff meet with Commissioner Scudiero to discuss his plans for the property but warned Plaintiff that "if [he] proceeded to lease the property without first obtaining approval from [Scudiero], . . . legal action would be taken against him." (*Id.* ¶ 25.) On July 17, 2009, Plaintiff did meet with Defendant Scudiero and again argued that the special use permit requirement was not applicable to his property. (*Id.* ¶ 27.) Defendant Scudiero asked Plaintiff to send her his plans for the subject property and promised that she would contact Plaintiff after she had reviewed them. (*Id.*) Plaintiff did send the plans to Defendant Scudiero, but she never responded. (*Id.*)

On September 4, 2009, Plaintiff received a phone call from William Wheaton, his painter, reporting that several individuals were entering the subject property through a back door. (*Id.* ¶ 29.) Wheaton told Plaintiff that the individuals "walked throughout the property for about one hour, and took photographs inside of the property." (*Id.*) When Plaintiff arrived at the scene, he discovered the individuals were inspectors from the City. Michael Hoskins, a zoning investigator, told Plaintiff he was there at Commissioner Scudiero's direction, that Plaintiff needed a permit for the "for-rent" sign on his property, and that Plaintiff would be issued a ticket unless he obtained such a permit by the end of that day.[3] (*Id.*) Another inspector, Jeff Samples, of the City's Conservation Department, admitted that he "had no real purpose for being at the property. . . ." (*Id.*) Michael

---

[3] Plaintiff does not state whether he attempted to acquire a permit for the sign.

Land, Defendant's Staff Assistant, was also present at the scene, but Wheaton told Plaintiff that he not see Land enter the property. (*Id.*) Plaintiff did not consent to the search of his property at any time, nor was he presented with a search warrant. (*Id.*)

In the end, Plaintiff never leased the subject property to Sigma. (*Id.* ¶ 30.) In the instant lawsuit, he challenges Defendants' interpretation of the Ordinance as applied to him, and alleges Defendants directed the illegal search of his property.

## **ANALYSIS**

When considering a motion to dismiss, the court accepts all well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *McCullah v. Gadert*, 344 F.3d 655, 657 (7th Cir. 2003). At this stage, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). In order to survive the motion, plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for violation of his Fourteenth and Fourth Amendment rights. Plaintiff has named the City of Chicago, Alderman Moore, and Commissioner Scudiero as Defendants. A municipality may be held liable under § 1983 only if the alleged violation is a product of the "government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dept. of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978). Plaintiff here argues that he meets this test in that his "constitutional injury was caused by a person with final policymaking authority." *Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006) (quoting *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir.1997)). As explained further below, Plaintiff's taking claim is now dismissed as unripe for review, but his equal protection and Fourth Amendment claims survive against the City

5

and against Defendants in their individual capacities.

## I. Fourteenth Amendment Claims

Plaintiff alleges two separate Fourteenth Amendment violations against Defendants. He claims that (1) Defendants caused a "taking" of his property because he was effectively deprived of the opportunity to lease the subject property to Sigma; and (2) Defendants violated equal protection by allowing another religious-based fraternity in Alderman Moore's ward to obtain a lease without a special use permit. Defendants seek to dismiss Plaintiff's taking claim as unripe under *Williamson County Reg. Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), and urge that Plaintiff has failed to successfully plead a "class of one" equal protection claim. The court addresses each argument in turn.

### A. Taking Claim

Plaintiff did not seek a special use permit to lease his property to Sigma because he believes that filing "an application for a special use permit would be an admission that Sigma is not a religious based organization." (Am. Compl. ¶ 31.) Plaintiff nevertheless contends that by causing him to lose Sigma as a prospective tenant, Defendants committed a "taking" of his property in violation of the Fourteenth Amendment. (Am. Compl. ¶ 43.) The court concludes that this claim is not ripe. In *Williamson County*, a property owner sued the Williamson County Regional Planning Commission and its staff members, claiming that the applicability of certain zoning regulations constituted a taking of his property. The Court reasoned that the taking claim was not ripe because the property owner failed to first seek compensation through available state procedures. *Williamson County*, 473 U.S. at 195. Since *Williamson County*, this Circuit has repeatedly recognized "a special ripeness doctrine for constitutional property rights claims, which preclude[s] federal courts from adjudicating land use disputes until: (1) the regulatory agency has had an opportunity to make a considered definitive decision, and (2) the property owner exhausts available state remedies for compensation." *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000).

In this case, Plaintiff cannot allege a taking of his property has occurred where he has not yet sought approval of his plans from the zoning board. Though courts must rule on federal questions, they need not do so if a land zoning board grants a plaintiff the requested relief. Thus, Plaintiff must first pursue a formal decision regarding the application of the zoning rules regarding "Covenants and Monasteries," to the subject property at issue before the court may rule on whether a taking has occurred. His taking claim is accordingly dismissed without prejudice.

B. **Equal Protection Claim**

Plaintiff contends that he informed Defendants that another religious-based fraternity in close proximity to the subject property was not subject to the special use permit requirement and that Defendants never responded to this claim. (Am. Compl. ¶ 33.) The court understands this as the basis for a "class of one" equal protection claim. Defendants argue that Plaintiff has failed to allege that he is similarly situated to the other fraternity and cannot show that he was intentionally treated differently without a rational basis for the difference in treatment. (Def.'s Mem. at 7-8.) Defendants may ultimately prevail on this defense, but the court concludes it is not a basis for dismissal pursuant to Rule 12(b)(6).

Defendants are correct that in order for a plaintiff to successful bring a "class of one" equal protection claim absent a fundamental right or suspect class, she must allege that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). For example, in *Forseth v. Vill. of Sussex*, two plaintiffs claimed that a county board president obstructed the development of their land because he stood to gain financially from blocking the project and because the proposed project offended his personal aesthetic preferences. *Forseth*, 199 F.3d at 370. In reviewing dismissal of the plaintiffs' equal protection claim, the Seventh Circuit explained that such a claim must be based on "the malicious conduct of a governmental agent, in order words, conduct that evidences a 'spiteful effort to "get" him for reasons wholly unrelated to

any legitimate state objective.'" *Id.* at 371 (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995)). The court found the Forseths met this burden because the county board president's alleged conduct raised "significant questions about whether he abused his official authority for personal gain at the expense of the Forseths' right to equal protection under the law." *Id.*

Construing the allegations of Plaintiff's complaint liberally, the court concludes that he does allege that Defendant Moore, as Alderman of the 49th Ward, and Defendant Scudiero, as Commissioner of Zoning and Land Use Planning, persons with final policymaking authority, caused his constitutional injury by treating the lease of his property differently than another similarly situated building. Defendants argue that Commissioner Scudiero is not a final policymaker, but it is fair for the court to assume for the purposes of this motion that she possessed final policymaking authority over the enforcement of the zoning regulations given her position as the Commissioner.[4]

Moreover, Plaintiff claims Alderman Moore warned that he was "'going to get'" Plaintiff and "'throw the book'" at Plaintiff if he continued to pursue his plans to lease Sigma the property. (Am. Comp. ¶ 23.) Such allegations are sufficient to state an equal protection claim based on malicious governmental conduct unrelated to a legitimate state objective. S*ee Esmail*, 53 F.3d at 180. Also, given that "*bona fide* equal protection claims arising from land-use decisions can be made independently from a takings claim and without being subject to *Williamson* ripeness," *Forseth*, 199 F.3d at 370, the court concludes that Plaintiff's equal protection claims survive against the City and Defendants individually. An "official capacity" claim against a governmental official amounts to a suit against the "government entity of which the official is a part." *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001); *see also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Plaintiff's official capacity claims against Defendants Moore and Scudiero are therefore dismissed as

---

[4] The claim that Defendant Scudiero is not a final policymaker is also undermined by the allegation that Plaintiff was warned by one of her deputies that she would be empowered to take legal action against Plaintiff if he leased his property to Sigma without prior approval. (Am. Comp. ¶ 25.)

redundant.

## II. Fourth Amendment Claim

Plaintiff also alleges municipal liability under §1983 against Defendants for a violation of the Fourth Amendment. He claims that Defendants Moore and Scudiero "set in motion" the events that led to the unauthorized search and seizure of the subject property by City inspectors, and that the City "officially sanctioned and/or ordered the actions of [Defendants] . . . ." (Am. Compl. ¶ 25-39.) Defendants argue in response that Plaintiff has failed to allege that Defendant Moore actually entered the subject property on September 4, 2009 or directed his staff assistant, Mike Land, to do so. (Def.'s Mem. at 9.) Defendants further contend that even though Plaintiff claims that one of the City inspectors searched his property at Defendant Scudiero's direction, Plaintiff has nonetheless failed to plead that Defendant Scudiero "directed the manner in which the [City] inspector acted or authorized him to engage in the alleged unconstitutional conduct." (*Id.* at 9-10.) For purposes of a Rule 12(b)(6) motion, the court concludes Plaintiff's allegations are sufficient.

The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," (*United States v. U.S. Dist. Ct. for Eastern Dist. of Mich.*, 407 U.S. 297, 313 (1972)) and thus, "warrantless entries are considered presumptively unreasonable." *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001) (citing *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir. 1995)). Defendants do not dispute that the City inspectors did not have a warrant and they do not contend the inspectors were permitted to execute a warrantless administrative search. Defendants instead contend they cannot be held liable because they were not present for the search and did not authorize it. Although it is true government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*, supervisors may be held liable if the "if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it." *Lanigan v. Village of East Hazel Crest,* 110 F.3d 467, 477 (7th Cir. 1997). Here, Plaintiff has not alleged that Defendants Moore and Scudiero should be

held liable simply on the basis of their supervisory relationship with the City inspectors. According to Plaintiff, the City inspectors did not search his property at their own discretion—they were specifically directed to do so by Defendants acting as final policymakers. The court concludes that Plaintiff may proceed with his Fourth Amendment claims against Defendants Moore and Scudiero individually, as well as against the City. For the reasons explained above, his official capacity claims against Defendants Moore and Scudiero are dismissed as duplicative of his claim against the City.

### III.  State Law Claims

Plaintiff's remaining state law claims bear little discussion. So far as the court can determine, his conspiracy claim rests on no more than parallel conduct on the part of Alderman Moore and Commissioner Scudiero. This is insufficient to raise a conspiracy claim above the speculative level, as required by *Twombly* and *Iqbal*. *See Doe v. Green*, 593 F. Supp.2d 523, 536 (W.D.N.Y. 2009) (dismissing conspiracy allegations based on "rank speculation"); *Morrison v. Sheffield,* No. 7:08-cv-00556, 2008 WL 5334370, at *2 (W.D.Va. Dec. 19, 2008) (dismissing civil rights conspiracy claim that was "devoid of any sufficient allegation of defendants' meeting of the minds and relie[d] on conjecture"). His additional claims for a violation of the zoning ordinance (Count I) and for injunctive relief (Count II) are premature for the same reason his taking claim is not ripe. Lastly, Count III must be dismissed under the doctrine that there is no claim for estoppel against the government absent "affirmative misconduct." A "false promise," or in this case, Defendants' alleged failure to respond to Plaintiff's planned use his property, is not sufficient to withstand a motion to dismiss. *Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002) (citing *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000) ("When asserting equitable estoppel against the government, one must also prove affirmative misconduct . . . . [O]missions amount only to ordinary negligence.").

### CONCLUSION

Defendants' motion to dismiss [19] is granted and denied in part. Plaintiff's official capacity claims against Defendants Moore and Scudiero are dismissed as redundant, but his equal protection and wrongful search claims against both Defendants in their individual capacities survive, as do his claims against the City for the Fourteenth and Fourth Amendment violations (Counts IV and V). Plaintiff's taking claim, as well as demands for a declaratory judgment (Count I) and injunctive relief (Count II) are dismissed without prejudice to renewal after Plaintiff has exhausted his state law remedies. Defendants are directed to file their answer to the claims that survive this motion within 28 days. Plaintiff will have leave to file an amended complaint upon seeking a special use permit, should he choose to do so.

ENTER:

Dated: January 6, 2011

_____
REBECCA R. PALLMEYER
United States District Judge